UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE INTEL CORPORATION

SECURITIES LITIGATION

Case No. 24-cv-02683-TLT

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 76

On October 30, 2024, Lead Plaintiffs Intel Investor Group and Byoung Wook Jeon (collectively, "Plaintiffs") filed an amended consolidated class action complaint against Intel Corporation and its executives, Chief Executive Officer ("CEO") Pat Gelsinger and Chief Financial Officer ("CFO") David Zinsner (collectively, "Defendants").  ECF 63.  In their Complaint, Plaintiffs assert violations of federal securities laws.  *Id.* ¶¶ 287–301.

Pending before the Court is Defendants' motion to dismiss the amended complaint.  ECF 76.  The Court finds this matter appropriate for resolution without oral argument and takes the matter under submission.  ECF 86; *see* L.R. 7(1)(b) (authorizing courts to dispense with oral argument on any motion except where an oral hearing is required by statute).

After review and consideration of motion, briefings, attachments and exhibits thereto, Defendants' motion to dismiss is **GRANTED**.

I.    **BACKGROUND**

A.    **Procedural History**

On May 3, 2024, Plaintiff Patricia Quille, individually and on behalf of all others similarly situated, filed a class action complaint against Defendants Intel, Gelsinger, and Zinsner.  ECF 1.  The Court related and consolidated *Construction Laborers Pension Trust of Greater St. Louis v. Intel Corporation et al*, 24-cv-04807, with the instant action.  ECF 43, 45.

The Court granted Intel Investor Group's and Byoung Wook Jeon's motion to be appointed co-Lead Plaintiffs.  ECF 54.  Plaintiffs subsequently filed an amended consolidated class action complaint.  ECF 63.  Plaintiffs allege that Defendants have violated (1) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and (2) Section 20(a) of the Exchange Act.  *Id.* ¶¶ 287–301.  The putative class action is on behalf of persons and entities that purchased or otherwise acquired the publicly traded common stock of Intel on a U.S. exchange, or purchased call options or sold put options on Intel common stock, between January 25, 2024, and August 1, 2024, inclusive (the "Class Period").  *Id.* ¶ 1.

On December 11, 2024, Defendants filed a motion to dismiss the amended complaint.  ECF 76.  With their motion, Defendants also request judicial notice of 33 exhibits.  ECF 77, 78.  Plaintiffs timely filed an opposition.  ECF 82.  Plaintiffs also request judicial notice of six exhibits.  ECF 83, 84.  Defendants timely filed a reply.  ECF 85.

**B.    Factual History**

**1.    The Parties**

Plaintiffs Garden Management Inc., AM Equity and Consulting LLC, Richard Arzillo, Byoung Wook Jeon, Kevin Geist, Albert Zhou, and Construction Laborers Pension Trust of Greater St. Louis are persons and entities that purchased or otherwise acquired the publicly traded common stock of Intel on a U.S. exchange, or purchased call options or sold put options on Intel common stock, during the Class Period.  ECF 63, ¶¶ 29–35.

Defendant Intel is incorporated under the laws of Delaware with its principal executive offices located in Santa Clara, California.  *Id.* ¶ 36.  Intel's common stock trades on the NASDAQ exchange under the symbol "INTC."  *Id.*  Defendants Intel CEO Pat Gelsinger and Intel CFO David Zinsner served in their roles prior to and during the Class Period.  *Id.* ¶¶ 37–38.

Intel boasts a product portfolio comprised of central processing units ("CPUs"), chipsets, processors, graphics processing units ("GPUs"), neural processing units ("NPUs"), and other semiconductor products.  *Id.* ¶ 39.  Intel, as a fully integrated device manufacturer ("IDM"), both designs and manufactures its own chips.  *Id.*  In contrast, Intel's competitors, Nvidia and Taiwan Semiconductor Manufacturing Company ("TSMC") are not IDMs.  *Id.*  Nvidia is a "fabless,"

United States District Court
Northern District of California

meaning it designs its own chips but does not manufacture them, and TSMC is a "foundry," meaning it manufactures chips but does not design them. *Id.* Plaintiffs allege that, while Intel has dominated the chip market for several decades, in the past 10 to 15 years, it has lagged behind competitors in advanced technologies and manufacturing. *Id.* ¶ 40.

### 2. Announcement and Implementation of IDM 2.0

In March 2021, Intel's new CEO Pat Gelsinger announced a new strategy called IDM 2.0. *Id.* ¶ 44. Under IDM 2.0, Intel would not only manufacture Intel chips and wafers for internal use by Intel's various business units ("BUs"), but it would also manufacture them for external sales to third parties. *Id.* As part of its strategy, Intel created a new business unit called Intel Foundry Services ("IFS") to manufacture chips for external customers. *Id.* Later in 2021, Gelsinger announced IFS's first major customers, Qualcomm and Amazon Web Services. *Id.* ¶ 48.

In October 2022, Intel announced that it would adopt an Internal Foundry Model starting in 2024. *Id.* ¶¶ 60, 64. Under the new model, Intel's design teams would be "on a similar footing as external [IFS] customers" and would "treat the foundry, from an accounting perspective, as a third-party business with which [they] would contract at arms-length." *Id.* ¶¶ 5, 61.

Intel expected the new operating model to create efficiencies. *Id.* ¶¶ 59, 69. "Previously, the design teams of Intel's product [BUs] had utilized Intel's foundries without regard to cost." *Id.* ¶ 5. This new model would put Intel "BUs on the same economic footing as external IFS customers," allowing BUs to "to be more agile, make better decisions and uncover efficiency and cost savings." *Id.* ¶ 62.

In fall 2022, Zinsner explained the IDM 2.0 Acceleration Office's initial goal was to "focus on driving $3 billion of cost reduction in 2023, 1/3 in cost of sales and 2/3 in operating expenses", with $8 to $10 billion in savings by the end of 2025. *Id.* ¶¶ 63, 67. On December 5, 2022, Zinsner stated that he had started to analyze profit and loss statements ("P&Ls") for the Internal Foundry Model "in the just spreadsheet kind of exercise" and concluded that it currently "[did] not work." *Id.* ¶ 68. Zinsner and Gelsinger needed to "create more accountability" for the Internal Foundry Model to succeed. *Id.*

United States District Court
Northern District of California

Throughout 2023, Defendants provided updates on the implementation of the Internal Foundry Model. In January 2023, Gelsinger said the Internal Foundry Model was "already gaining momentum internally" and regarding the $8 to $10 billion in cost savings by 2025, Zinsner said "we're getting a lot of that [cost savings] from our internal foundry model." *Id.* ¶¶ 69, 70. In April 2023, Zinsner said "our shift to an internal foundry model is already demonstrating a path to the structural cost improvements." *Id.* ¶ 77.

In June 2023, Zinsner said Intel was "already seeing benefits of this newfound transparency and accountability." *Id.* ¶¶ 83. Zinsner also stated that "we look at our OpEx as a percent of revenue in the foundry business. And it's relatively high given our need to accelerate our node transitions and the investments necessary to do that." *Id.* ¶ 89. From these statements, Plaintiffs allege that Defendants "regularly reviewed the full Foundry's standalone P&Ls and knew the actual operating expense" were "well beyond merely 'relatively high.'" *Id.* ¶ 91.

In September 2023, Zinsner stated "by separating out . . . manufacturing" Intel can "kind of isolate [the foundry] business's P&L now . . . [and] relative to peers . . . [i]t's not in a good place." *Id.* ¶ 97. When asked about Intel's gross margins moving forward, Zinsner continued, "what Pat has said, which I subscribe to, as the finance guy is our goal is to get to 60 [percent] gross margins . . . . [G]iven this internal foundry model, what we can drive in terms of efficiencies makes us even more confident in our ability to get to the 60 [percent] margin." *Id.* ¶ 98.

In October 2023, Gelsinger said, "We remain on track to reducing costs by $3 billion in 2023, and we continue to see significant incremental opportunities for operational improvement as we execute on our internal foundry model." *Id.* ¶ 99. Zinsner said "we're now measuring the manufacturing and TD [Technology Development] organization as a separate P&L" and "[w]e see the product organizations already starting to optimize [their use of Foundry services] . . . [a]nd we're already starting to see improvements in the P&L because of that." *Id.* ¶ 100.

### 3. The Market Reacts to Intel's Internal Foundry Model

On January 25, 2024, on Intel's year-end 2023 earnings call, Gelsinger said: "We have officially transitioned to this new operating model on January 1, [2024,] and we'll report the new

segmentation format as part of our Q1 earnings." *Id.* ¶¶ 107–08.  On February 21, 2024, Intel announced that its new operating segments would be called Intel Products and Intel Foundry.  *Id.* ¶ 118.  Intel reported its Q4 and fiscal year ("FY") 2023 financial results, including $952 annual revenue for IFS (up 103 percent) and annual segment losses of $482 million.  *Id.* ¶¶ 199, 200, 206.

After market close on April 2, 2024, Intel recast its results under the Internal Foundry Model—now, referred to as the Intel Foundry.  *Id.* ¶¶ 15, 217.  The results revealed that the product units performed better in 2023 after shedding Internal Foundry Model losses of $7 billion.  *Id.* ¶ 15.  Financial analysts and journalists reported the results in the news.  *Id.* ¶ 141 (Morgan Stanley: "We were prepared for weaker numbers but that is certainly higher than our initial expectations."); *id.* ¶ 138 (Reuters: "Intel on Tuesday disclosed deepening operating losses for its foundry business" and "Intel shares were down 4.3 [percent] after the documents were filed with the [SEC]."); *id.* ¶ 139 (CNBC: "Intel shares fall after company reveals $7 billion operating loss in foundry."); *id.* ¶ 140 (Yahoo! Finance: "Intel's foundry unit posted $7 billion operating loss in 2023.").  In response, Intel's stock price dropped $3.61 a share (8.2 percent) to close at $40.33 on April 3, 2024.  *Id.* ¶¶ 137, 219.

On April 25, 2024, Intel reported Q1 2024 financial results, revealing that Foundry revenue declined to $4.369 billion, down 15.6 percent compared to Q4 2023 revenues of $5.175 billion.  *Id.* ¶ 221.  The stock price dropped $3.23 a share (9.2 percent) to $31.88 on April 26, 2024.  *Id.* ¶ 151.

On August 1, 2024, Intel announced its Q2 2024 results, showing that Intel's operating margin dropped from 8.4 percent in Q1 2024 to 15.3 percent in Q2 2024, with the main cause allegedly being Foundry Model's operating losses at $2.83 billion, up 14.3 percent from Q1 2024.  *Id.* ¶ 164.  Intel suspended its dividend and said it would lay off 15 percent of its workforce (~15,000 employees).  *Id.* ¶ 165.  Intel's stock price fell $7.57 a share (26 percent) to close at $21.48 on August 2, 2024.  *Id.* ¶¶ 172, 226.

### 4.  Intel Did Not Report Internal Foundry Model Financials for FY2023

Plaintiffs challenge Intel's FY2023 financial statements.  *Id.* ¶¶ 179–98.  Plaintiffs allege that "Intel's failure to disclose the financial results for the Internal Foundry Model for the year

United States District Court
Northern District of California

ended December 31, 2023 violated [Generally Accepted Accounting Principles ("GAAP")] with respect to proper segment reporting and allowed Intel to conceal the wild unprofitability of its internal foundry segment." *Id.* ¶ 180.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss Pursuant to Rule 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  To overcome a motion to dismiss, a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008).  However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (citations omitted).

### B.    Rule 9(b) and PSLRA

"Securities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc*., 774 F.3d 598, 604 (9th Cir. 2014). Plaintiffs alleging securities fraud must plead all the elements of a securities fraud action with particularity, including "circumstances constituting fraud or mistake."  *Id.* at 605; Fed. R. Civ. P. 9(b).

In addition, under the PSLRA, plaintiffs are required to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (citations omitted).  To properly plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement

United States District Court
Northern District of California

is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1).  To properly plead scienter, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id*. § 78u–4(b)(2).  Regarding the "strong inference" standard, a complaint will survive a motion to dismiss, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 310 (2007).

## III.    JUDICIAL NOTICE

"The [C]ourt may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Alternatively, the Court may "consider materials that are submitted with and attached to the Complaint.  [The Court] may also consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document."  *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011).  The Ninth Circuit has cautioned against the "unscrupulous use of extrinsic documents" under these exceptions, which "risks premature dismissals of plausible claims."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018).

Here, Defendants request judicial notice of thirty-three exhibits and Plaintiffs request judicial notice of six exhibits.  ECF 77, 83.  Neither party opposes judicial notice of the exhibits.  The Court will address each request in turn.

### A.    Defendants' Requests

Defendants request judicial notice of thirty-three exhibits which are broadly presented in five categories.  ECF 77, at 1–5.  The Court **GRANTS** request for judicial notice of all 33 exhibits.

United States District Court
Northern District of California

United States District Court
Northern District of California

1     Exhibits 1 to 6 are Intel's SEC filings, which are publicly available on the SEC's website.

2 ECF 78.  Courts in securities actions routinely take judicial notice of SEC filings.  *See Metzler Inv.*

3 *GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (judicial notice of SEC

4 filings is "proper").  In addition, these exhibits are relied on in the Complaint and are incorporated

5 by reference as well.  ECF 63, *id.* ¶¶ 10, 15, 103, 179, 188, 205–06, 218, 251–53 (Ex. 1); *id.* ¶¶

6 17–18, 151 (Ex. 2); *id.* ¶¶ 19, 22, 164, 172 (Ex. 3); *id.* ¶¶ 15, 129–30, 138, 194, 197, 217 (Ex. 4);

7 *id.* ¶¶ 17, 145 (Ex. 5); *id.* ¶¶ 128, 211 (Ex. 6).  The Court finds that Exhibits 1 to 6 are

8 incorporated by reference and alternatively, are appropriate documents for judicial notice.

9     Exhibits 7 to 20 are transcripts of investor earnings calls and conferences and investor

10 presentations.  ECF 78.  Courts in securities actions routinely take judicial notice of investor call

11 transcripts and presentations.  *See, e.g.*, *Plumbers & Pipefitters Loc. Union #295 Pension Fund v.*

12 *CareDx, Inc.*, No. 22-cv-03023-TLT, 2023 WL 4418886, at *2–3 (N.D. Cal. May 24, 2023)

13 (judicial notice of "transcripts from CareDx's earnings calls" and "transcripts from conferences

14 where Defendants gave remarks"); *In re Nektar Therapeutics*, No. 18-cv-06607-HSG, 2020 WL

15 3962004, at *7 (N.D. Cal. July 13, 2020) (judicial notice of "investor presentation transcripts" and

16 "investor presentation slide decks").  In addition, these exhibits are relied on in the Complaint and

17 are incorporated by reference as well.  ECF 63, ¶¶ 62–65 (Ex. 7); *id.* ¶¶ 68, 263 (Ex. 8); *id.* ¶¶ 71–

18 72 (Ex. 9); *id.* ¶ 80 (Ex. 10); *id.* ¶¶ 9, 82–88, 99, 194, 231, 237 (Exs. 11 & 12); *id.* ¶ 97 (Ex. 13);

19 *id.* ¶¶ 107, 202–04, 239 (Ex. 14); *id.* ¶¶ 14, 118–21, 171 (Ex. 15); *id.* ¶¶ 122–27, 208 (Ex. 16); *id.*

20 ¶¶ 131–36, 233 (Exs. 17 & 18); *id.* ¶¶ 146–50, 166, 213–14 (Ex. 19); *id.* ¶¶ 20, 166–71 (Ex. 20).

21 The Court finds that Exhibits 7 to 20 are incorporated by reference and alternatively, are

22 appropriate documents for judicial notice.

23     Exhibits 21 to 25 are press releases issued by Intel.  ECF 78.  Courts in securities actions

24 routinely take judicial notice of press releases.  *See, e.g.*, *Farhar v. Ontrak, Inc.*, 714 F. Supp. 3d

25 1198, 1207 (C.D. Cal. 2024) (judicial notice of press releases as a "matter of public record").  In

26 addition, Exhibits 21, 23, 24, and 25 are relied on in the Complaint and are incorporated by

27 reference as well.  ECF 63, ¶¶ 44, 246 (Ex. 21); *id.* ¶¶ 11, 104, 199–201 (Ex. 23); *id.* ¶¶ 134, 266–

28

67 (Ex. 24); *id.* ¶¶ 15, 217 (Ex. 25). The Court finds that Exhibits 21 and 23 to 25 are incorporated by reference and alternatively, Exhibits 21 to 25 are appropriate documents for judicial notice.

Exhibits 26 to 32 are analyst reports about Intel. ECF 78. Courts in securities actions "routinely take judicial notice of analyst reports." *In re Century Aluminum Sec. Litig.*, No. C 09-1001 SI, 2011 WL 830174, at *9 (N.D. Cal. Mar. 3, 2011); *see Par Inv. Partners, L.P. v. Aruba Networks, Inc.*, 681 F. App'x 618, 620 n.1 (9th Cir. 2017) (judicial notice of analyst reports). In addition, the Complaint relies on Exhibit 32, a Morgan Stanley analyst report. ECF 63, ¶ 141 (Ex. 32). The Court finds that Exhibit 32 is incorporated by reference and alternatively, Exhibits 26 to 32 are appropriate documents for judicial notice.

Exhibit 33 is Accounting Standards Codification 280 of U.S. Generally Accepted Accounting Principles, which Plaintiffs rely on in the Complaint. ECF 78; ECF 63, ¶¶ 185–196. Courts also routinely take judicial notice of accounting standards. *See, e.g.*, *Mehedi v. View, Inc.*, No. 21-cv-06374-BLF, 2024 WL 3236706, at *5 (N.D. Cal. June 28, 2024) (judicial notice of accounting standards because they "are 'capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned'"). The Court finds that Exhibit 33 is incorporated by reference and alternatively, appropriate for judicial notice.

**B.    Plaintiffs' Requests**

Plaintiffs' request judicial notice of six exhibits. ECF 83, at 1–2. The Court **GRANTS** request for judicial notice of all six exhibits.

Exhibit 1 is *The New York Times* article titled *The White House Bet Big on Intel. Will it Backfire?* ECF 84-1. Exhibit 5 is a *Bloomberg* article titled *Intel Suffers Worst Decline in Two Months on Downbeat Outlook*. ECF 84-5. Exhibit 6 is the Barclays analyst report titled *The Ditch Gets Deeper*. ECF 84-6. All three exhibits are quoted and relied on in the Complaint and are therefore incorporated by reference. ECF 63, ¶ 270 (Ex. 1); *id.* ¶ 220 (Ex. 5.); *id.* ¶ 153 (Ex. 6); *see SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, No. 22-cv-03811-TLT, 2024 WL 3579322, at *8 (N.D. Cal. July 29, 2024) (considering documents quoted in the complaint as incorporated by reference).

1    Exhibit 2 is Intel's Q3 2024 Form 10-Q, a publicly available SEC filing.  ECF 84-2.  As

2   noted previously, courts in securities actions routinely take judicial notice of SEC filings.  *See*

3   *Metzler*, 540 F.3d at 1064 n.7 (9th Cir. 2008).  The Court therefore finds that Exhibit 2 is an

4   appropriate document for judicial notice.

5    Exhibit 3 is *The New York Times* article titled *Nvidia Will Replace Intel in the Dow Jones*

6   *Stock Index*.  ECF 84-3.  Plaintiffs request judicial notice for the undisputed fact regarding the

7   changing contents of the Dow Jones Index.  ECF 83, at 2.  The Court finds that Exhibit 3 is an

8   appropriate document for judicial notice.

9    Exhibit 4 is Intel's press release titled *Intel Announces Retirement of CEO Pat Gelsinger*.

10   ECF 84-4.   As noted previously, courts in securities actions routinely take judicial notice of press

11   releases.  *See, e.g.*, *Farhar*, 714 F. Supp. 3d at 1207.  The Court finds that Exhibit 4 is an

12   appropriate document for judicial notice.

13   **IV.    DISCUSSION**

14    **A.    Section 10(b) and Rule 10b-5**

15    To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege the following

16   elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

17   connection between the misrepresentation or omission and the purchase or sale of a security; (4)

18   reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *In re*

19   *Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting *Halliburton Co. v.*

20   *Erica P. John Fund, Inc*., 134 S.Ct. 2398, 2407 (2014)).

21    In their motion to dismiss, Defendants assert that Plaintiffs are unable to satisfy falsity,

22   scienter, and loss causation. ECF 76, at 10–25.

23    **1.    Falsity**

24    To plead falsity, the complaint must "specify each statement alleged to have been

25   misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

26   the statement or omission is made on information and belief, . . . state with particularity all facts

27   on which that belief is formed."  15 U.S.C. § 78u–4(b)(1).  Statements and omissions are

28   actionably false if they "directly contradict what the defendant knew at that time" or "create an

United States District Court
Northern District of California

impression of a state of affairs that differs in a material way from the one that actually exists." *Khoja*, 899 F.3d at 1008; *Brody v. Transitional Hosps. Corp*., 280 F.3d 997, 1006 (9th Cir. 2002). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false," does not meet the falsity standard. *Metzler Inv.*, 540 F.3d at 1070.

Here, Plaintiffs challenge two types of statements: (1) Intel's audited 2023 financial statements for not reporting results for the Internal Foundry Model, and (2) various statements made by Gelsinger and Zinsner about Intel's prospects. ECF 63, ¶¶ 199–214. The Court will address each type of statement in turn.

### a.   Plaintiffs fail to allege falsity as to Intel's 2023 FY Financial Statements.

Plaintiffs put forth two theories regarding Intel's 2023 FY financial statements: (1) the IFS reporting results were misleading, and (2) GAAP required financial reporting based on the Internal Foundry Model in 2023. Defendants argue that neither theory is supported by particularized pleaded facts. ECF 76, at 10–11.

### i.   IFS Reporting Results

For the IFS reporting results, Plaintiffs argue that Defendants only reported the IFS results in 2023 in order to conceal that the full Foundry operations lost $7 billion. ECF 82, at 10. As an initial matter, Plaintiffs do not argue that the IFS reporting results were false. Rather, Plaintiffs argue that the IFS reporting results misleadingly omitted the Internal Foundry Model results in the FY 2023.

Plaintiffs argue that Defendants used IFS and the Internal Foundry Model interchangeably prior to the April 2024 recast, which created confusion for investors. *Id.* at 11. For example, in May 2023, Stuart Pann, the head of the IDM 2.0 Acceleration Office, said: "IFS has an ambitious goal to become the second-largest foundry by 2030." ECF 63, ¶ 79. Intel's 2023 Form 10-K stated that Intel sought to "establish IFS as a major provider of foundry services that provides semiconductor manufacturing solutions for others and *for ourselves*." *Id.* ¶ 103 (emphasis added). Following an interview with Gelsinger, Reuters reported: "IFS will break out financials beginning in the second quarter of next year, Gelsinger said." *Id.* ¶ 102. Even after Intel's Foundry Day

11

United States District Court
Northern District of California

1    event on February 21, 2024, some analysts still referred to the Internal Foundry Model as IFS.  *See*

2    ECF 78-32, at 1; ECF 84-6, at 1.

3        Plaintiffs analogize to *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir.

4    2023).  In *NVIDIA*, plaintiffs had sufficiently alleged that a substantial part of NVIDIA's crypto-

5    related revenue during the proposed Class Period came from sales of GeForce GPUs sold to crypto

6    miners.  *Id.* at 929.  This revenue was reported in NVIDIA's Gaming segment.  *Id.*  However,

7    defendants' statements failed to state or substantially understated the extent to which NVIDIA's

8    Gaming-segment revenues were based on sales of these GeForce GPUs.  *Id.* at 936.  Because

9    defendants' statements led investors and analysts to believe that NVIDIA's crypto-related

10   revenues were much smaller than they were, the court found these statements to be materially false

11   or misleading.  *Id.*  Plaintiffs argue that, like in *NVIDIA*, Defendants' failure to report Internal

12   Foundry Model financials, and instead tout IFS financials, was materially misleading.

13       Defendants argue that no particularized allegations indicate that Intel ever suggested, or

14   that anyone believed, IFS's results were indicative of what Intel Foundry's results were.  Intel's

15   June 2023 webinar explained that IFS served only "External Foundry Customers."  ECF 78-12, at

16   7.  Intel stated repeatedly that the Internal Foundry Model, in which a foundry segment would

17   report both external and internal revenue, would not be adopted until 2024.  *See, e.g.*, ECF 63, ¶¶

18   9, 64, 71, 76; *see also* ECF 78-1, at 8.  Intel's 2023 10-K, which reported IFS's results, referred

19   repeatedly to IFS's customers.  *See, e.g.*, ECF 63, ¶ 206 ("help our customers lead in their

20   industries"); ECF 78-1, at 34 ("fuel the growth of our customers"); *id.* at 51 ("plans to establish

21   IFS as a major provider of foundry capacity to manufacture semiconductors for others").  Further,

22   Zinsner reiterated on the Q4 2023 earnings call that, when Intel provided recast results later in Q1

23   2024, the recast results would be the "first view of our manufacturing P&L."  ECF 63, ¶ 108.

24       Defendants also contend that the Complaint contains a false chart that misstates the recast

25   results as showing a $7 billion loss for "IFS."  *Compare* ECF 63, ¶ 15 *with* ECF 78-4, at 9

26   (showing $7 billion loss for "Intel Foundry," not "IFS").  The recast results indicate that IFS is one

27   portion of Intel Foundry, which "includes foundry technology development, foundry

28

1   manufacturing and supply chain, and foundry services (formerly IFS)."  ECF 78-25, at 2; *see also*

2   ECF 78-4, at 2; ECF 78-11, at 3, 4.

3          The Court agrees with Defendants.  While some reporters and analysts may have misstated

4   the IFS for the Internal Foundry Model, this mixing was not related to the FY 2023 financial

5   reporting.  The Court also finds *NVIDIA* to be distinguishable here.  In *NVIDIA*, NVIDIA

6   "understated its cryptocurrency-related revenue by $1.35 billion" by reporting the revenues in its

7   Gaming segment.  81 F.4th at 929.  In contrast, here, there are no allegations that indicate that

8   Defendants led investors to believe that the IFS reporting results for FY 2023 included results for

9   the entire Internal Foundry Model.

10         The Complaint itself misleadingly conflates IFS and the Internal Foundry by showing the

11  recast $7 billion loss for IFS rather than the Internal Foundry.  *Compare* ECF 63, ¶ 15 *with* ECF

12  78-4, at 9.  Plaintiffs argue that the chart simply compares the original IFS numbers with the recast

13  numbers.  But that is not the case.  In their chart, Plaintiffs incorrectly attribute the $7 billion loss

14  to IFS.  The Court finds that Plaintiffs have failed to allege falsity as to the IFS Reporting Results

15  for the FY 2023.

16                          **ii.    Violation of GAAP**

17         Plaintiffs argue that "[u]nder GAAP, Intel was required to disclose the standalone results

18  of the Foundry segment . . . as of December 31, 2023."  ECF 63, ¶ 188.  Defendants bring forth

19  three counterarguments.  ECF 76, 13–16.

20         First, Defendants contend that Intel's independent auditors at Ernst & Young LLP opined

21  that Intel's financial statements, including the segment results, "present fairly, in all material

22  respects, the financial position of the Company on December 30, 2023 and December 31, 2022,

23  and the results of its operations and its cash flows for each of the three years in the period ended

24  December 30, 2023, in conformity with U.S. generally accepted accounting principles."  ECF 78-

25  1, at 71.  Plaintiffs do not allege that anyone thought that Intel should have reported re-segmented

26  results, under the Internal Foundry Model, earlier than it did—not the SEC, not any analyst, and

27  not any current or former Intel employee acting as a "confidential witness."  Defendants contend

28  that courts regularly dismiss accounting-based securities claims against the backdrop of clean

United States District Court
Northern District of California

1    audit opinions and no restatements.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981,

2    997 n.5 (9th Cir. 2009); *Metzler*, 540 F.3d at 1068–69.

3         Plaintiffs counter that the lack of a restatement and a clean audit opinion do not absolve

4    Intel from liability for GAAP violations.  They point to *In re LDK Solar Securities Litigation*,

5    where the court found that lack of a restatement, a clean audit opinion, an audit committee finding

6    no wrongdoing, or the termination of an SEC investigation was not sufficient to counter a finding

7    a falsity.  584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008).

8         The Court finds *LDK* to be distinguishable because, as Defendants point out, Plaintiffs

9    omit several distinguishing facts.  Specifically, in *LDK*, an auditor "warned [LDK]'s board of

10   directors that LDK's inventory accounting was inadequate" and the SEC investigated.  *Id.* at

11   1237–38.  Further, a "whistleblower" hired to fix accounting problems resigned in protest, telling

12   the CFO that "with respect to LDK's finances, '[t]he actual story is quite different from what the

13   investors expect or are told.'"  *Id.* at 1248 (citations omitted).  But here, there are no similar facts

14   that strength the inference of falisty.  Further, the court found that the auditor's "unqualified

15   opinion did not necessarily exonerate LDK" because, unlike here, it "did not specifically discuss

16   the time periods at issue."  *Id.* at 1246.  Thus, the Court finds *LDK* to be distinguishable from the

17   instant action.

18        Plaintiffs also argue that cases cited by Defendants in which a company never altered its

19   earlier financial reporting are inapposite because Intel recast its 2023 financial statements just a

20   few months after they were issued.  ECF 82, at 8; *see also* ECF 76, at 13–14 (collecting cases).

21   However, here, a recasting is not an amending or restating of results.  Plaintiffs specifically allege

22   that the earlier financial results were "recast."  ECF 63, ¶ 15.  Further, Intel makes clear that

23   recasting "does not . . . amend or restate [its] audited consolidated financial statements that were

24   included in the 2023 Form 10-K."  ECF 78-4, at 2.  The Court does not find Plaintiffs' arguments

25   to be persuasive.

26        Second, Defendants argue that Plaintiffs never dispute that Intel reported in 2023 the

27   segments that reflected the way Gelsinger, the chief operating decision maker ("CODM"),

28   "internally receives information and manages and monitors [its] operating segment performance."

ECF 78-1, at 85.  The Accounting Standards Codification No. 280, Segment Reporting ("ASC 280"):

> requires that general-purpose financial statements include selected information reported on a single basis of segmentation.  The method for determining what information to report is referred to as the management approach.  The management approach is based on the way that management organizes the segments within the public entity for making operating decisions and assessing performance.

ECF 63, ¶ 185.  Defendants contend that because Plaintiffs do not dispute that Gelsinger received and used information based on the existing segments that Intel reported in 2023, Plaintiffs fail to show that GAAP did not require reporting those segments as Intel's "single basis of segmentation."  ECF 63, ¶ 185.

However, Plaintiffs do not make the argument that Defendants suggest.  Plaintiffs do not complain that segments reported by Intel in 2023 violated GAAP.  Rather, Plaintiffs allege that because the Internal Foundry Model had the characteristics of an operating segment set forth in ASC 280-10-50-1, the Internal Foundry Model should have also been separately reported in 2023.  ECF 63, ¶¶ 191–98.  Defendants address this in their third argument.

Third, Defendants argue Plaintiffs fail to plead with particularity that GAAP's requirements for reporting segment results were satisfied in 2023 for the Internal Foundry Model.  ASC 280-10-50-1 provides:

> An operating segment is a component of a public entity that has all of the following characteristics: (a) It engages in business activities from which it may recognize revenues and incur expenses (including revenues and expenses relating to transactions with other components of the same public entity); (b) Its operating results are regularly reviewed by the public entity's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance; and (c) Its discrete financial information is available."

ECF 63, ¶ 191; *see* ECF 78-33, at 7 (ASC 280-10-50-1).  Defendants challenge Plaintiffs' allegations for subsection (b).  Defendants assert that Plaintiffs do not sufficiently allege that Gelsinger regularly reviewed the Internal Foundry Model's operating results in 2023 to make decisions about resources to be allocated to the segment and assess its performance.

1    Plaintiffs counter that Gelsinger and Zinsner repeatedly told investors they had reviewed

2  and acted on the Internal Foundry Model P&L information.  As an initial matter, the Complaint

3  concedes that Gelsinger was the CODM under GAAP.  ECF 63, ¶ 194.  Thus, Zinsner's alleged

4  review of the Internal Foundry Model is not relevant to the inquiry.  However, some of Zinsner's

5  statements may be relevant to whether Gelsinger was regularly reviewing the Internal Foundry

6  Model's operating results in 2023.

7    On December 5, 2022, Zinsner said that he had analyzed the P&L for the Internal Foundry

8  Model "in the just spreadsheet kind of exercise" and he and Gelsinger realized they "actually

9  need[ed] to create more accountability."  ECF 63, ¶ 68.  While this statement suggests that Zinsner

10  reviewed preliminary version of the P&L for the Internal Foundry Model, it does not suggest that

11  Gelsinger did or that he was regularly reviewing it.

12    On May 31, 2023, Plaintiffs allege that, in a conference, Gelsinger was asked how Intel

13  would improve its gross margins in the future.  *Id.* ¶ 80.  Gelsinger pointed to "driving

14  efficiencies" with the Internal Foundry Model, which would allow Intel to see its Foundry

15  manufacturing P&L on a standalone basis.  *Id.*  He explained "we've already started to do this. . .

16  [w]e're playing around with it this year and then hopefully, we get it to a point where we can

17  actually segment or report next year in this way."  *Id.*  However, as Defendants point out,

18  Plaintiffs incorrectly attribute these statements to Gelsinger, when these statements were actually

19  made by Zinsner.  *Compare* ECF 63, ¶ 80 *with* ECF 78-10, at 9; *Gonzalez v. Planned Parenthood

20  of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) ("Although we normally treat all of plaintiff's factual

21  allegations in a complaint as true, we 'need not . . . accept as true allegations that contradict

22  matters properly subject to judicial notice or by exhibit.'").  Thus, these statements do not indicate

23  that Gelsinger regularly reviewed P&Ls in 2023.

24    Similarly, on September 6, 2023, Zinsner stated that Intel could now "kind of" isolate the

25  Internal Foundry Model's P&L, and it was not in a good place.  *Id.* ¶ 97.  Two weeks later,

26  Zinsner said that Gelsinger's goal for Intel was to get to 60 percent gross margins.  *Id.* ¶ 98.  These

27  statements also do not suggest that Gelsinger was regularly reviewing the operating results for

28  Internal Foundry Model.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs point to two more of Gelsinger's statements arguing that they suggest that Gelsinger had reviewed the Internal Foundry Model's operating results.  On October 26, 2023, Gelsinger stated that "We remain on track to reducing costs by $3 billion in 2023, and we continue to see significant incremental opportunities for operational improvement as we execute on our internal foundry model." *Id.* ¶ 99.  On December 14, 2023, an article credited Gelsinger for stating that Intel already operates two separate companies—a chip design business and a factory unit.  *Id.* ¶ 102.  However, these two statements do not suggest that Gelsinger regularly reviewed the Internal Foundry Model's operating results in 2023.

Defendants urge the Court to consider *In re Netflix, Inc. Sec. Litig.*, 923 F. Supp. 2d 1214, 1218 (N.D. Cal. 2013).  In *Netflix*, plaintiffs alleged that Netflix "misled investors about the prospects of [its] new streaming-focused model" by not reporting re-segmented results until 4Q11.  *Id.* at 1218.  Plaintiffs formulated their own approximations of how Netflix could have financially separated the DVD and streaming components of the hybrid plan.  *Id.* However, the court dismissed the claim finding that "there is no indication that Netflix had discrete financial information for its streaming and DVD components until 4Q11."  *Id.*  Similarly, here, Defendants argue that Plaintiffs at best speculate that the financial information for the Internal Foundry Model was able to be separated sooner.  However, the Court finds *Netflix* is not on point as Zinsner's statements do suggest that Internal Foundry Model P&L was available in a preliminary form in September 2023.  *See* ECF 63, ¶ 97.  But Zinsner's statements do not suggest Gelsinger regularly reviewed this information.

Defendants also urge the Court to consider *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707 (E.D. Va. 2003).  In *Circuit City*, Plaintiffs alleged that Circuit City should have reported results for its consumer-credit business earlier than it did.  *Id.* at 717.  The Court found that plaintiffs' allegations were conclusory as they did not support "their claim with citations to documents, meetings, or individuals that may have conveyed information."  *Id.*  As an "additional independent" ground for dismissal, the court held that "failure to challenge the independent auditors' opinions weakens an allegation that a defendant violated GAAP."  *Id.* at 719.

The Court finds *Circuit City* to be persuasive.  Here, Plaintiffs rely on a few statements made by Gelsinger and Zinsner to suggest that the Internal Foundry Model's financials were separable and Gelsinger regularly reviewed them in 2023.  However, these statements do not meet the "higher, more exacting pleading standards" of the PSLRA.  *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 604.  Similarly, Plaintiffs cited cases are distinguishable as their allegations are supported by more than a few statements made by Defendants.  *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968 (S.D. Ohio 2008) (alleging four witnesses who said "Gen-X had separate offices, separate management" and "kept discrete financial information and had separate accounting and financial officers," and Huffy CEOs who called Gen-X a "freestanding subsidiary" and "segment"); *Krystek v. Ruby Tuesday, Inc.*, 2016 WL 1274447, at *8 (M.D. Tenn. Mar. 31, 2016) (finding that "[d]efendants d[id] not actually dispute that Lime Fresh is a distinct operating segment that requires separate financial disclosures," nor "that they had access to data" needed to report it).

Relying on Gelsinger's and Zinsner's statements, Plaintiffs argue that more particularized facts such as meeting dates and report titles are unnecessary.  The Court disagrees.  The Court finds that Plaintiffs have not sufficiently alleged falsity as to Intel's 2023 FY financial statements.

### b. Plaintiffs Fail to Allege Falsity as to Gelsinger's and Zinsner's Statements Regarding the Internal Foundry Model.

Defendants argue that Plaintiffs have also failed to allege falsity as to statements made by Gelsinger and Zinsner regarding the Intel Foundry Model.  ECF 78, at 16–18.  In response, Plaintiffs argue that these statements are sufficiently alleged.  ECF 82, at 12–13.

### i. Efficiencies Statements

In their motion, Defendants argue that Plaintiffs fail to show that statements about expected future efficiencies were false or misleading when made.  ECF 63, ¶ 204 ("we expect to unlock further cost savings and efficiencies in 2024 and beyond"; "[w]e see incremental efficiencies"); *id.* ¶ 206 ("we look to build on this success"); ¶ 208 ("I think we'll start to see a lot of the efficiencies . . . ."); *id.* ¶ 209 ("We're going to chip away at trying to drive efficiencies this year.").  Defendants argue that these statements are not actionable under the PSLRA's safe harbor for forward-looking statements.

"'[A] defendant will not be liable for a false or misleading statement if it is forward-looking and either is accompanied by cautionary language or is made without actual knowledge that it is false or misleading.'" *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021); *see* 15 U.S.C. § 78u-5(c)(1). Here, Defendants argue that the safe harbor applies because "statement[s] of the plans and objectives of management for future operations," and "assumptions underlying or relating to" plans and objectives, are forward-looking. 15 U.S.C. § 78u-5(i)(1).

In response, Plaintiffs argue that the Defendants ignore the present-tense portions of the statements. The PSLRA's safe harbor does not apply in an all-or-nothing fashion, because some statements about the future may combine non-actionable forward-looking statements with actionable non-forward-looking statements. *Wochos*, 985 F.3d at 1190 (9th Cir. 2021) (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017)). In these mixed statements, only the forwarding-looking aspects are immunized from liability. *Id.*

Here, the Court agrees with Plaintiffs that the statements contain non-forward-looking portions. Plaintiffs specifically point to three statements. ECF 82, at 12 n.13. In the January 25, 2024 earnings call, Gelsinger stated that "[t]hird-party engagements with IFS continue to validate our progress on this technology" and "rapid adoption of AI . . . is proving to be a significant tailwind for IFS." ECF 63, ¶ 204. In Intel's 2023 Form 10-K, Intel reported that "The momentum and customer commitments we are seeing demonstrate that our strategy and offerings are resonating." *Id.* ¶ 206. At a conference on March 6, 2024, Zinsner stated that "We can be profitable . . . and still drive significant profitability for the overall Intel company because we get the margin stacking benefit in at least the part of the business that we sell into our own fabless portion of our business." *Id.* ¶ 208.

However, none of these statements are actionable. The first two statements that Plaintiffs point to are regarding IFS—not the Internal Foundry Model. Plaintiffs do not allege that these statements are false regarding IFS. Here, Defendants' observations regarding IFS, followed by Defendants' forward-looking optimistic statements regarding the Internal Foundry Model do not render these statements actionable. Further, the Court agrees with Defendants that these statements are "so imprecise and noncommittal that they are incapable of objective verification."

1   *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022).  Finally, the third

2   statement that Plaintiffs point to is forward-looking as Zinsner speculates how Intel can be

3   profitable in the future.  *Wochos*, 985 F.3d at 1190.  Plaintiffs have not sufficiently alleged falsity

4   as to the efficiencies statements.

**ii.      Traction and Demand Statements**

6          Plaintiffs argue that in Intel's Annual Report filed on March 28, 2024, Gelsinger made

7   false and misleading statements when he stated that Intel was "seeing significant traction" and

8   "growing demand for our foundry offering."  ECF 63, ¶ 211.  Plaintiffs argue that this statement

9   was materially misleading because both internal and external demand shrank during the quarter.

10  *Id.* ¶ 221.

11         Defendants argue that Plaintiffs ignore the context of the statements.  ECF 85, at 8.

12  Gelsinger's traction and growing demand statements were directed to four customer commitments

13  and five wins.  ECF 63, ¶ 211.  Defendants contend that Plaintiffs conflate demand with current-

14  quarter revenue, ignoring the fact that the statement was directed at future revenue.

15         Plaintiffs cite to *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919 (N.D. Cal. 2022).  In

16  *Splunk*, defendants had made statements leading investors to believe that "Splunk was making

17  investments in marketing and in sales personnel to the extent necessary to build adequate pipeline

18  and meet the company's revenue and growth targets."  *Id.* at 932.  However, plaintiffs alleged that

19  defendants had actually suspended investments in marketing, frozen hiring as to sales personnel,

20  and laid off sales employees to impact the company's ability to build adequate pipeline and meet

21  its revenue and growth targets.  *Id.*

22         Similarly, here, Plaintiffs argue that Gelsinger's growing demand statement would lead a

23  reasonable investor to believe that external Foundry sales were increasing.  ECF 82, at 13.

24  However, Plaintiffs' argument ignores the explicit context in which Gelsinger's statements were

25  made.  Gelsinger clearly cites to four customer commitments and five wins when making his

26  statements.  ECF 63, ¶ 211.  The direct contradiction in *Splunk* is not present here.  The Court

27  finds that Plaintiffs have not alleged falsity as to the growing demand statements.

**iii.      Savings Statements**

20

United States District Court
Northern District of California

Defendants also argue that Gelsinger and Zinsner's statements referring to Intel achieving $3 billion in savings in 2023 are not actionable because Plaintiffs do not allege that Intel did not achieve those savings.  ECF 76, at 17–18.  Plaintiffs argue that Defendants repeatedly linked the $3 billion in saving to the Internal Foundry Model.  ECF 82, at 12 n.12.

Plaintiffs point to several statements in their complaint.  ECF 76, at 12 n.12.  Zinsner discussed the Internal Foundry Model as one part of Intel's strategy to reducing costs in 2024 and 2025.  *Id.* ¶¶ 63, 84.  During Intel's Q3 2023 earning call, Gelsinger stated that "We remain on track to reducing costs by $3 billion in 2023, and we continue to see significant incremental opportunities for operational improvement as we execute on our internal foundry model."  ECF 63, ¶ 99.  In a FY2023 Press Release, Zinsner stated that Intel "comfortably achieved our commitment to deliver $3 billion in cost savings in 2023."  *Id.* ¶ 201.  Plaintiffs specifically point to an investor presentation from January 25, 2024, which highlights "Operational Efficiencies" and directly below states ">$3B in FY'23, Internal Foundry Model."  *Id.* ¶ 202.

Defendants argue that the statements make clear that the $3 billion in 2023 saving was never linked to the Internal Foundry Model.  Defendants contend that the Internal Foundry Model was part of Intel's long-term operational efficiencies goal and did not reflect the $3 billion in saving Intel achieved in 2023.  The Court agrees with Defendants.  The statements outlined by Plaintiffs make clear that that the $3 billion in cost savings was a separate initiative from the Internal Foundry Model.  The Court finds that Plaintiffs have not alleged falsity as to the savings statements.

### iv.    On Track Statement

Plaintiffs also argue that Gelsinger's statement on April 25, 2024, that "we are right on track with where we expect it to be right now" is actionable.  ECF 63, ¶ 213.  In an earnings call, Gelsinger stated about the Intel Foundry: "We are executing on our strategy to drive meaningful improvement in profitability over time.  We are obviously not there yet, given the large upfront investment we needed to build out this business.  But we always said this was going to be a multiyear plan, and we are right on track with where we expect it to be right now."  *Id.*

In *Wochos v. Tesla, Inc.*, Telsa made various statements that it was "on track" to achieve its goal to produce 5,000 vehicles per week. 985 F.3d at 1192. The Ninth Circuit held that this unadorned statement was unquestionably a forward-looking statement that was not actionable. *Id.*

Plaintiffs argue that the statement here is distinguishable the statement in *Wochos* because Gelsinger's statement is not unadorned. Rather, Plaintiffs argue that the substantially higher losses in 2024, the low Q1 external revenue and falling internal revenue, and the delay of 20A chips for Arrow Lake at the time showed that the Internal Foundry Plan was not on track.

Here, Gelsinger's statement reflects optimism to overcome the Intel Foundry's financial results and remain on track for their multiyear plan. Even if *Wochos* did not apply, "optimistic statements indicating that a company is 'on track' to meet a certain goal are, without more, inactionable puffery." *In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017), *aff'd*, 756 F. App'x 779 (9th Cir. 2019). The Court does not find that this statement is actionable.

### 2. Scienter and Loss Causation

Defendants also challenge scienter and loss causation. However, because the Court finds that Plaintiffs have failed to allege falsity, the Court need not reach these elements. *Wochos*, 985 F.3d at 1188 ("[W]e find the issue of falsity to be dispositive, and we therefore do not reach the issues of scienter or loss causation with respect to that complaint.").

The Court finds that Plaintiffs have failed to alleged falsity. Accordingly, the Court **GRANTS** the motion to dismiss as to the Section 10(b) and Rule 10b-5 claims.

### B. Section 20(a)

"In order to prove a prima facie case under [Section] 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . .; and (2) that the defendant exercised actual power or control over the primary violator . . . ." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citation omitted). "Section 20(a) provides derivative liability for those who control others found to be primarily liable under the Act." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012) (citation omitted). "Where a plaintiff asserts a Section

United States District Court
Northern District of California

22

20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same." *Id*. (citation omitted).

Because the Court finds that Plaintiffs have failed to properly allege a Section 10(b) and Rule 10b-5 claim, Plaintiffs have likewise failed to allege a Section 20(a) claim. Accordingly, the Court **GRANTS** the motion to dismiss as to the Section 20(a) claim.

### C.   Leave to Amend

Pursuant to Rule 15(a)(2), a party may amend its pleadings with the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id*. This policy is applied with "extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir. 2003) (internal citation omitted). The nonmovant bears the burden of demonstrating why leave to amend should not be granted. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). The Supreme Court has outlined five factors to consider in deciding whether leave to amend is warranted: (1) bad faith on the part of the movant, (2) undue delay by the movant, (3) repeated amendments by the movant, (4) undue prejudice to the nonmovant, and (5) futility of the proposed amendment. *Foman*, 371 U.S. 178 at (1962).

Defendants argue that leave to amend should not be granted. Defendants contend that "[b]ecause Plaintiff[s'] allegations are all based on publicly-filed documents—and not, as is the case in many securities fraud cases, on the statements of confidential witnesses . . . it is difficult to imagine what additional facts Plaintiff[s] could allege to satisfy the strict pleading requirement of the PSLRA and Rule 9(b)." *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal. 2007).

Here, the Court finds that amendment is not futile. Plaintiffs may amend to add particularized facts in support of their falsity allegations. However, the Court warns Plaintiffs to avoid mischaracterization and misattribution of statements in its second amended complaint and in future briefings.

Plaintiffs may not plead new claims. Should the scope of any amendment exceed the leave to amend granted by this order, the Court will strike the offending portions of the pleading under

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Rule 12(f).  *See* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient

2    defense or any redundant, immaterial, impertinent, or scandalous matter.  The court may strike

3    from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous

4    matter.  The court may act: (1) on its own; or (2) on motion made by a party either before

5    responding to the pleading or, if a response is not allowed, within 21 days after being served with

6    the pleading").

7        Over Defendants' objection, Plaintiffs may file a second amended complaint no later than

8    March 24, 2025.  A failure to meet this deadline will result in dismissal with prejudice under

9    Federal Rule of Civil Procedure 41(b).

10        A Further Case Management Conference is set for 5/15/2025 at 2:00 PM in San Francisco

11    - Videoconference Only. The Joint Case Management Statement is due by 5/8/2025.

12    **V.      CONCLUSION**

13        For the reasons stated above, the Court **GRANTS** Defendants' motion to dismiss.

14    Plaintiffs' claims for violation of Section 10(b) and Rule 10b-5 and Section 20(a) are dismissed

15    with leave to amend.

16        This Order resolves ECF 76.

17        **IT IS SO ORDERED.**

18    Dated: March 3, 2025

19

20                                      TRINA L. THOMPSON
                                        United States District Judge

21

22

23

24

25

26

27

28