1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

IN RE INTEL CORPORATION

Case No. 24-cv-02683-TLT

8

SECURITIES LITIGATION

9

**ORDER GRANTING MOTION TO DISMISS**

10

Re: ECF 91

11
12      Disclosing incomplete information may mislead investors while withholding information

13  erodes investor trust.  Corporations walk this tightrope with Generally Accepted Accounting

14  Principles ("GAAP") guiding their decisions.

15      In the instant action, the Court dismissed the first amended consolidated class action

16  complaint with leave to amend.  ECF 87.  On March 24, 2025, Lead Plaintiffs Intel Investor Group

17  and Byoung Wook Jeon (collectively, "Plaintiffs") filed a second amended consolidated class

18  action complaint against Intel Corporation and its executives, Chief Executive Officer ("CEO")

19  Pat Gelsinger and Chief Financial Officer ("CFO") David Zinsner (collectively, "Defendants").

20  ECF 88.  In their complaint, Plaintiffs assert violations of federal securities laws, surrounding

21  Defendants' statements regarding Intel's Internal Foundry.  *Id.* ¶¶ 338–52.

22      Before the Court is Defendants' motion to dismiss the second amended complaint.  ECF

23  91.  After review and consideration of motion, briefings, attachments and exhibits thereto,

24  Defendants' motion to dismiss is **GRANTED** with prejudice for all claims.

25  **I.  BACKGROUND**

26      **A.  Procedural History**

27      On May 3, 2024, Plaintiff Patricia Quille, individually and on behalf of all others similarly

28  situated, filed a class action complaint against Defendants Intel, Gelsinger, and Zinsner.  ECF 1.

1   The Court related and consolidated *Construction Laborers Pension Trust of Greater St. Louis v.*

2   *Intel Corporation et al*, 24-cv-04807, with the instant action.  ECF 43, 45.

3       The Court granted Intel Investor Group's and Byoung Wook Jeon's motion to be appointed

4   co-Lead Plaintiffs.  ECF 54.  Plaintiffs subsequently filed an amended consolidated class action

5   complaint.  ECF 63.  The Court granted Defendants' motion to dismiss the amended complaint

6   and provided Plaintiffs with leave to amend.  ECF 87.

7       On March 24, 2025, Plaintiffs filed a second amended consolidated class action complaint.

8   ECF 88.  Plaintiffs again allege that Defendants have violated (1) Section 10(b) of the Securities

9   Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and (2)

10  Section 20(a) of the Exchange Act.  *Id.* ¶¶ 338–52.  The putative class action is on behalf of

11  persons and entities that purchased or otherwise acquired the publicly traded common stock of

12  Intel on a U.S. exchange, or purchased call options, or sold put options on Intel common stock,

13  between January 25, 2024, and August 1, 2024, inclusive (the "Class Period").  *Id.* ¶ 1.

14      On April 21, 2025, Defendants filed a motion to dismiss the second amended complaint.

15  ECF 91.  With their motion, Defendants also request judicial notice of 34 exhibits.  ECF 92, 93.

16  Plaintiffs timely filed an opposition.  ECF 97.  Plaintiffs also request judicial notice of two

17  exhibits.  ECF 98, 99.  Defendants timely filed a reply.  ECF 100.  The Court heard oral argument

18  on July 8, 2025.

19      **B.    Factual History**

20      The factual allegations in the amended complaint remain largely consistent with the factual

21  allegations in the second amended complaint.  *Compare* ECF 63 *with* ECF 88.

22          **1.  The Parties**

23      Plaintiffs Garden Management Inc., AM Equity and Consulting LLC, Richard Arzillo,

24  Byoung Wook Jeon, Kevin Geist, Albert Zhou, and Construction Laborers Pension Trust of

25  Greater St. Louis are persons and entities that purchased or otherwise acquired the publicly traded

26  common stock of Intel on a U.S. exchange, or purchased call options, or sold put options on Intel

27  common stock, during the Class Period.  ECF 88, ¶¶ 29–32.

28

United States District Court
Northern District of California

2

Defendant Intel is incorporated under the laws of Delaware with its principal executive offices located in Santa Clara, California. *Id.* ¶ 33. Intel's common stock trades on the NASDAQ exchange under the symbol "INTC." *Id.* Defendants Intel CEO Pat Gelsinger and Intel CFO David Zinsner served in their roles prior to and during the Class Period. *Id.* ¶¶ 34–36.

Intel boasts a product portfolio comprised of central processing units ("CPUs"), chipsets, processors, graphics processing units ("GPUs"), neural processing units ("NPUs"), and other semiconductor products. *Id.* ¶ 37. Intel, as a fully integrated device manufacturer ("IDM"), both designs and manufactures its own chips. *Id.* In contrast, Intel's competitors, Nvidia and Taiwan Semiconductor Manufacturing Company ("TSMC") are not IDMs. *Id.* Nvidia is a "fabless," meaning it designs its own chips but does not manufacture them, and TSMC is a "foundry," meaning it manufactures chips but does not design them. *Id.* Plaintiffs allege that, while Intel has dominated the chip market for several decades, in the past 10 to 15 years, it has lagged behind competitors in advanced technologies and manufacturing. *Id.* ¶ 38.

### 2. Announcement of the IDM 2.0 Strategy

In March 2021, Intel's new CEO Pat Gelsinger announced a new strategy called IDM 2.0. *Id.* ¶ 43. Under IDM 2.0, Intel would not only manufacture Intel chips and wafers for internal use by Intel's various business units ("BUs"), but it would also manufacture them for external sales to third parties. *Id.* As part of its strategy, Intel created a new business unit called Intel Foundry Services ("IFS") to manufacture chips for external customers. *Id.* ¶ 43. Later in 2021, Gelsinger announced IFS's first major customers, Qualcomm and Amazon Web Services. *Id.* ¶ 47.

### 3. Announcement of the Internal Foundry

On October 11, 2022, Intel published an announcement to its website titled "Intel Embraces an Internal Foundry Model," stating "CEO Pat Gelsinger introduces an internal foundry model for both external customers and Intel product lines." *Id.* ¶ 55. Gelsinger said that as the "next phase of our IDM 2.0 journey," Intel would "embrace an internal foundry model, not only for our external customer commitments but also for our Intel product lines." *Id.* ¶ 56. Intel would "put [internal] product groups on a similar footing as external [IFS] customers" and "create a foundry accounting model that encompasses manufacturing, technology development and Intel

Foundry Services." *Id.* ¶ 57. Gelsinger acknowledged in October 2022 that "we expect to share full internal foundry [Profit and Loss ("P&L")] into calendar year '24." ECF 93-7, Exhibit ("Ex.") 7, at 6.

Throughout 2023, both Gelsinger and Zinsner provided updates regarding the status of the internal foundry model implementation. *See* ECF 88, ¶¶ 69–123.

### 4. Implementation of the Intel Foundry

On Intel's January 25, 2024 earnings call, Gelsinger said: "We have officially transitioned to this new operating model on January 1, and we'll report the new segmentation format as part of our Q1 earnings." ECF 93-14, Ex. 14, at 8. Zinsner also said: "We intend to provide you with recast historical financials this quarter," which would be "the first view of our manufacturing P&L." ECF 88, ¶ 128. On February 21, 2024, Gelsinger said, "[w]e're establishing two vibrant new organizations" that would be called Intel Products and Intel Foundry. *Id.* ¶ 137.

Finally, on April 2, 2024, to "facilitate comparisons of our current operating segments with our operating segments in prior periods," Intel shared versions of its 2021-2023 financial statements recast as if the new "internal foundry" model had been in place in those years. ECF 93-4, Ex. 4, at 2. The recast results indicated that the Intel Foundry segment would have had a loss of $7 billion in FY 2023, as it would have been charged with manufacturing expenses "previously allocated primarily to [Client Computing Group], [Data Center and Artificial Intelligence], and [Networking and Edge]." *Id.* ¶ 147.

In response to the recast results, financial analysts and journalists reported the results in the news. *Id.* ¶ 158 (Morgan Stanley: "We were prepared for weaker numbers but that is certainly higher than our initial expectations."); *id.* ¶ 155 (Reuters: "Intel on Tuesday disclosed deepening operating losses for its foundry business" and "Intel shares were down 4.3 [percent] after the documents were filed with the [SEC]."); *id.* ¶ 156 (CNBC: "Intel shares fall after company reveals $7 billion operating loss in foundry."); *id.* ¶ 157 (Yahoo! Finance: "Intel's foundry unit posted $7 billion operating loss in 2023."); *id.* ¶ 159 (Investing.com: "[T[he fact that foundry economics have been awful is not (or should not have been) a huge surprise; in fact, the company directly suggested this back in June . . . . That being said, . . . the idea that a -37 [percent] operating margin

4

1    and $7B loss do not yet represent a trough is somewhat breathtaking especially given all the cost

2    cuts the company was supposedly implementing last year.").  Intel's stock price dropped $3.61 a

3    share (8.2 percent) to close at $40.33 on April 3, 2024.  *Id.* ¶¶ 14, 154, 268.

4         On April 25, 2024, Intel reported Q1 2024 financial results, revealing that Foundry

5    revenue declined to $4.369 billion, down 15.6 percent compared to Q4 2023 revenues of $5.175

6    billion.  *Id.* ¶ 270.  The stock price dropped $3.23 a share (9.2 percent) to $31.88 on April 26,

7    2024.  *Id.* ¶ 271.

8         On August 1, 2024, Intel announced its Q2 2024 results, showing that Intel's operating

9    margin dropped from 8.4 percent in Q1 2024 to 15.3 percent in Q2 2024, with the main cause

10   allegedly being the Intel Foundry's operating losses at $2.83 billion, up 14.3 percent from Q1

11   2024.  *Id.* ¶ 183.  Intel suspended its dividend and said it would lay off 15 percent of its workforce

12   (~15,000 employees).  *Id.* ¶ 184.  Intel's stock price fell $7.57 a share (26 percent) to close at

13   $21.48 on August 2, 2024.  *Id.* ¶¶ 20, 275.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6)

16        Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which

17   relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To overcome a motion to dismiss, a plaintiff's

18   "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible

19   chance of success.'"  *Levitt v. Yelp! Inc*., 765 F.3d 1123, 1135 (9th Cir. 2014) (citing *Ashcroft v.

20   Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).  "A claim

21   has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

22   reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at

23   678 (citing *Twombly*, 550 U.S. at 556).  The court "accept[s] factual allegations in the complaint

24   as true and construe[s] the pleadings in the light most favorable to the nonmoving party."

25   *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008).  However,

26   "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule

27   12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (citations omitted).

28

United States District Court
Northern District of California

### B.    Rule 9(b) and PSLRA

"Securities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Plaintiffs alleging securities fraud must plead all the elements of a securities fraud action with particularity, including "circumstances constituting fraud or mistake." *Id.* at 605; Fed. R. Civ. P. 9(b).

In addition, under the PSLRA, plaintiffs are required to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (citations omitted).  To properly plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1).  To properly plead scienter, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id*. § 78u–4(b)(2).  Regarding the "strong inference" standard, a complaint will survive a motion to dismiss, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 310 (2007).

### III.    JUDICIAL NOTICE

"The [C]ourt may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Alternatively, the Court may "consider materials that are submitted with and attached to the Complaint.  [The Court] may also consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document."  *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011).  The Ninth Circuit has

United States District Court
Northern District of California

6

cautioned against the "unscrupulous use of extrinsic documents" under these exceptions, which "risks premature dismissals of plausible claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018).

Here, Defendants request judicial notice of thirty-four exhibits and Plaintiffs request judicial notice of two exhibits. ECF 92, 99. Many of these exhibits were judicially notice in connection with the previous motion to dismiss. *See* ECF 87, at 7–10. Neither party opposes judicial notice of the exhibits. The Court will address each request in turn.

### A.    Defendants' Requests

Defendants request judicial notice of thirty-four exhibits. ECF 92, at 1–5. Exhibits 1 to 33 were judicially noticed or incorporated by reference by the Court in its previous order. *See* ECF 87, at 7–9. Accordingly, the Court **GRANTS** request for judicial notice for Defendants' Exhibits 1 to 33.

Defendants also request judicial notice of Exhibit 34. ECF 92, at 5–6. Exhibit 34 is an article posted on the website Stratechery that is quoted in the second amended complaint, titled "An Interview with Intel CEO Pat Gelsinger About Intel's Progress Towards Process Leadership." *Id.* at 5. Courts in securities actions have taken judicial notice of news articles and material on public websites. *See, e.g.*, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) ("judicial notice that the market was aware of the information contained in news articles"); *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 895 (N.D. Cal. 2022) ("'Publicly accessible websites and news articles are among the proper subjects of judicial notice.'"). Further, the second amended complaint incorporates the exhibit by reference. *See* ECF 88, ¶¶ 122, 245. Accordingly, the Court **GRANTS** request for judicial notice for Defendants' Exhibit 34.

### B.    Plaintiffs' Requests

Plaintiffs request judicial notice of two exhibits. ECF 99. Both Exhibits 1 and 2 were judicially noticed by the Court in its previous order. *See* ECF 87, at 9. These Exhibits are also incorporated by reference in the second amended complaint. ECF 88, ¶¶ 269 (Ex. 1), 173 (Ex. 2). Accordingly, the Court **GRANTS** request for judicial notice for Plaintiffs' Exhibits 1 and 2.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    DISCUSSION

### A.    Section 10(b) and Rule 10b-5

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2407 (2014)).

The issues before the Court are largely the same as in its prior order.  *See* ECF 87.  In their motion to dismiss, Defendants contend that Plaintiffs are unable to plead falsity, scienter, and loss causation.  *See* ECF 91, at 10–25.

#### 1.    Falsity

To plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1).  Statements and omissions are actionably false if they "directly contradict what the defendant knew at that time" or "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Khoja*, 899 F.3d at 1008; *Brody v. Transitional Hosps. Corp*., 280 F.3d 997, 1006 (9th Cir. 2002). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false," does not meet the falsity standard.  *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

In its prior order, the Court found that Plaintiffs had failed to allege falsity.  ECF 87, at 10– 22.  The Court provided Plaintiffs with leave to amend to add more particularized facts to support their falsity allegations.  *Id.* at 23.

Like the previous complaint, Plaintiffs assert falsity allegations regarding (1) Intel's audited FY 2023 financial statements for not reporting results for the Internal Foundry Model, and

(2) various statements made by Gelsinger and Zinsner about Intel Foundry's prospects.  ECF 88, ¶¶ 199–208.  The Court will address each type of statement in turn.

### a. Plaintiffs again fail to allege falsity as to Intel's FY 2023 Financial Statements.

Plaintiffs again put forth two theories regarding Intel's 2023 FY financial statements: (1) the IFS reporting results were misleading, and (2) GAAP required financial reporting based on the Internal Foundry in 2023.  The Court will determine whether Plaintiffs' new allegations are sufficient to allege falsity.

### i. Defendants' IFS Reporting Results were not false or misleading.

Plaintiffs allege that Intel's FY 2023 Financial Statements were false and misleading.  ECF 88, ¶¶ 199–202.  Specifically, Plaintiffs allege that that FY 2023 Financial Statements were misleading because Defendants reported "only external foundry financial results—a tiny piece of the overall foundry picture," while omitting the Internal Foundry's financial results.  *Id.* ¶ 202.  Plaintiffs do not contend that Defendants represented to investors that the FY 2023 Financial Statements for IFS included the Internal Foundry's financial results.  ECF 97, at 7.  Neither do Plaintiffs allege that Intel investors were misled by the IFS reported results.  *Id.*  Rather, Plaintiffs contend Defendants' non-disclosure of its full foundry results, and touting of only its IFS results, misled investors.  *Id.* at 8.  "[T]he massive difference between reported IFS losses and the full foundry's losses is the point of the case."  *Id.* at 9.

Plaintiffs again analogize to *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023).  In *NVIDIA*, plaintiffs had sufficiently alleged that a substantial part of NVIDIA's crypto-related revenue during the proposed class period came from sales of GeForce GPUs sold to crypto miners.  *Id.* at 929.  This revenue was reported in NVIDIA's Gaming segment.  *Id.*  Because defendants' statements led investors and analysts to believe that NVIDIA's crypto-related revenues were much smaller than they were, the court found these statements to be materially false or misleading.  *Id.* at 936.  *NVIDIA* is not directly on point because there are no allegations that incorrect numbers were reported in the IFS reporting.  Rather, Plaintiffs argue that like in *NVIDIA*,

United States District Court
Northern District of California

1  "Defendants misled investors as to the extent of risk facing Intel's full foundry by burying the

2  bulk of its financial results in the reporting for Intel's other segments."  ECF 97, at 7.

3       Here, Plaintiffs' allegations are largely a restatement of their previous allegations that the

4  Court rejected in its prior order.  *See* ECF 87, at 11–13.  In essence, Plaintiffs ask the Court to

5  reconsider its ruling as to falsity for the FY 2023 IFS financial results.

6       The Court declines to do so.  As stated in the previous order, *NVIDIA* is distinguishable

7  because here, there are no allegations that suggest investors believed IFS reporting results for FY

8  2023 also included results for the Internal Foundry.  Defendants repeatedly communicated to

9  investors that the Internal Foundry financial results would not be reported until 2024, *see, e.g.*,

10  ECF 88, ¶ 229 ("Intel announced that the accounting under its internal foundry model would be

11  publicly reported in the first quarter of 2024 . . . ."); ECF 93-7, Ex. 7, at 6; ECF 93-9, Ex. 9, at 10;

12  ECF 93-11, Ex. 11, at 3, 5; ECF 93-22, Ex. 22, at 2; and that IFS was only one part of what would

13  become the Intel Foundry, *see, e.g.*, ECF 88, ¶ 107 ("a separate P&L for our manufacturing group,

14  inclusive of IFS . . . ."); *id.* ¶ 229 ("a new manufacturing group segment—inclusive of

15  manufacturing, technology development, and Intel Foundry Services (IFS)").

16       In June 2023, Zinsner told investors that the expenses of "our manufacturing, technology

17  development and IFS groups" were "obscured by the lack of transparency inherent in an allocated

18  cost model."  ECF 88, ¶ 90.  Analysts were aware that the Intel Foundry would bear "most of the

19  costs associated with the company."  *See, e.g.*, ECF 93-26, Ex. 26, at 1.

20       The Court understands Plaintiffs' frustrations.  For FY 2023, Defendants did not report its

21  Internal Foundry results in a consolidated manner with its IFS results, resulting in the obscuring of

22  $7 billion in foundry losses.  However, Defendants were clear that Intel Foundry financial results

23  were obscured and would not be reported until 2024.  For the reasons stated here and in its prior

24  order, the Court finds that Plaintiffs have failed to allege falsity as to Defendants' financial

25  reporting of IFS.

26               **ii.**     **Violation of GAAP**

27       Plaintiffs again allege that Defendants' failure to report its full foundry financial results as

28  a segment for FY 2023 violated GAAP.  ECF 88, ¶¶ 232–63.  Plaintiffs' allegations are now

bolstered with additional statements that allege that Gelsinger regularly reviewed P&Ls for the Internal Foundry in 2023 and observations from a retained accounting consultant. *Id.*

Defendants assert similar challenges as in the first motion to dismiss. First, Defendants contend that its independent auditors found that the FY 2023 financial statements conformed with GAAP. ECF 91, at 12–13. Second, Defendants argue GAAP prerequisites for reporting the Internal Foundry were not met in 2023 because Plaintiffs fail to allege—even with their new allegations—that Gelsinger, as the chief operating decision maker ("CODM"), "regularly reviewed" "operating results" for Intel Foundry and used them "to make decisions about resources to be allocated to the segment and assess its performance." *Id.* at 13–15. Finally, Defendants assert that Plaintiffs' allegations regarding observations from a retained accounting consultant do not support a finding of a GAAP violation. *Id.* at 15–17.

As recognized in the prior order, Intel's independent auditors at Ernst & Young LLP ("EY") opined that Intel's financial statements, including the segment results, "present fairly, in all material respects, the financial position of the Company on December 30, 2023 and December 31, 2022, and the results of its operations and its cash flows for each of the three years in the period ended December 30, 2023, in conformity with U.S. generally accepted accounting principles." ECF 93-1, Ex. 1, at 71. On April 2, 2024, Intel shared recast results for 2021–2023 "to facilitate comparisons" and stated that doing so "does not . . . amend or restate our audited consolidated financial statements." ECF 93-4, Ex. 4, at 2.

Defendants argue that courts have repeatedly dismissed securities claims against the backdrop of a lack of restatement of financial statements and a clean audit opinion. ECF 91, at 12 (collecting cases); *see, e.g.*, *Zucco*, 552 F.3d at 998 n.5 ("It is also notable that despite the many allegations in the SAC relating to Digimarc's fraudulent use of inventory reserves the corporation did not restate inventory reserves when it formally published its restatement on April 5, 2005."); *Metzler*, 540 F.3d at 1069 (9th Cir. 2008) ("The [complaint] does not allege that Corinthian's external auditors counseled against the practice . . . [rather] the [complaint] does draw its own legal conclusion that the practice was improper . . . .").

In its prior order, the Court found that the lack of a restatement and a clean audit opinion cut against a finding of falsity. *See* ECF 87, at 13–14. Plaintiffs again argue that a clean audit opinion and lack of restatement do not demonstrate the absence of falsity. ECF 97, at 15. Plaintiffs' expert Harris Devor, a Certified Public Accountant ("CPA") with over 50 years of experience, opines that EY's audit should not be relied on because it is impossible to know what EY knew and what testing is performed. *Id.* (citing ECF 88, ¶ 262). The Court does not find Plaintiffs' arguments to be persuasive in light of Defendants' cited caselaw. As it did in its previous order, while not dispositive, the Court finds that the lack of a restatement and a clean audit opinion cut against a finding of falsity.

Defendants next argue that Plaintiffs have not alleged particularized facts that show GAAP prerequisites for reporting were met in FY 2023 for the Internal Foundry. ECF 91, at 13–15. Plaintiffs allege that because the Internal Foundry had the characteristics of an operating segment set forth in Accounting Standard Codification ("ASC") 280-10-50-1, the Internal Foundry should have also been separately reported as its own segment in FY 2023. ECF 88, ¶¶ 223–58. ASC 280-10-50-1 provides:

> An operating segment is a component of a public entity that has all of the following characteristics: (a) It engages in business activities from which it may recognize revenues and incur expenses (including revenues and expenses relating to transactions with other components of the same public entity); (b) Its operating results are regularly reviewed by the public entity's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance; and (c) Its discrete financial information is available.

ECF 88, ¶ 222; *see* ECF 93-33, at 7 (ASC 280-10-50-1). Defendants again challenge Plaintiffs' allegations for subsection (b). ECF 91, at 13–15. The Complaint alleges that Gelsinger was the CODM. *See* ECF 88, ¶¶ 34, 236. Defendants assert that Plaintiffs, even with their new allegations, do not sufficiently allege that Gelsinger regularly reviewed the Internal Foundry's operating results in 2023 to make decisions about resources to be allocated to the segment and assess its performance. *Id.*

The Court previously found that Plaintiffs' reliance on "Zinsner's statements . . . suggest[ing] that Internal Foundry Model P&L was available in a preliminary form in September

1    2023", ECF 87, at 17, did not meet the "higher, more exacting pleading standards" of the PSLRA

2    to allege that Gelsinger regularly reviewed the results to make decisions about resources to be

3    allocated to the segment and assess its performance, *id.* at 18. The Court gave Plaintiffs leave to

4    add more particularized facts including any allegations of meeting dates and report titles. *Id.*

5           Here, Plaintiffs continue to allege statements regarding the Internal Foundry P&Ls the

6    Court previously rejected by themselves in its prior order. *See, e.g.*, ECF 88, ¶ 67 ("spreadsheet

7    kind of exercise"); *id.* ¶ 83 ("playing around with it"); *id.* ¶ 116 ("separating out kind of the

8    manufacturing" and "kind of isolate that business's P&L now"); *id.* ¶ 120 ("we continue to see

9    incremental opportunities for operational improvement"); *id.* ¶ 123 ("[i]n some ways, Intel already

10   operates two separate companies"). These statements, primarily made by Zinsner, did not by

11   themselves suggest that Gelsinger regularly reviewed the Internal Foundry's operating results in

12   2023. *See* ECF 87, at 16–18.

13          However, Plaintiffs now allege additional statements by Gelsinger. ECF 88, ¶¶ 69, 71, 73,

14   75, 77, 107, 109–11, 120, 124. Plaintiffs contend that these additional statements, taken with the

15   prior alleged statements, are sufficient to show Gelsinger's direct involvement in implementing

16   and assessing the operational impact of the Internal Foundry. ECF 97, at 10.

17          In January 2023, Gelsinger spoke about Intel's implementation of the internal foundry,

18   claiming that "[w]e have identified 9 different subcategories for operational improvement" and the

19   "new approach is already gaining momentum internally." ECF 88, ¶ 69. In February 2023, after

20   announcing a dividend cut, Gelsinger stated "in Q3 [2022], we announced that we established an

21   internal foundry model and are providing incremental transparency to our owners by reporting our

22   manufacturing group as a separate operating segment in 2024, giving them a P&L for the first time

23   in the company's history, and by so doing, creating what we believe will be a superior incentive

24   structure and clarity of benchmarking to external peers." *Id.* ¶ 71. Gelsinger also stated that

25   Intel's "idea of the 2 different operational models of the company is something that we're well

26   underway with. We've called it the IDM 2.0 acceleration office." *Id.* ¶ 73. Gelsinger noted that

27   "the IDM 2.0 strategy, the progression of our process technology development and the migration

28   to our internal foundry model" was discussed substantially at the recent Board meeting. *Id.* ¶ 75.

United States District Court
Northern District of California

1    In July 2023, Gelsinger stated that through the implementation of the Internal Foundry,

2    Intel had identified "gains in efficiency, including factory loading, test and sort time reduction,

3    packaging cost improvements, litho field utilization improvements, reductions in staffing,

4    expedites and many more." *Id.* ¶ 107.

5    In August 2023, Gelsinger discussed the implementation of Internal Foundry, stating that

6    the implementation was changing the culture of the company. *Id.* ¶ 111. Specifically, "design

7    teams" were "looking at their product decisions through the lens of a wafer price." *Id.* The design

8    teams were "making different design decisions." *Id.* Intel was charging its "internal teams for

9    wafer expedites and new product introductions." *Id.* Gelsinger stated that this was causing teams

10   to get efficient and more disciplined which would he predicted would eventually lead to cost

11   savings. *Id.* Gelsinger stated that with regard to the appropriate disciplines and accountabilities in

12   the company, he gets "to sit somewhat as judge and jury on some of these tradeoffs." *Id.*

13   In October 2023, Gelsinger stated that "We remain on track to reducing costs by $3 billion

14   in 2023, and we continue to see significant incremental opportunities for operational improvement

15   as we execute on our internal foundry model." *Id.* ¶ 120. Finally, in December 2023, Gelsinger

16   stated that Intel was taking the implementation of the Internal Foundry very seriously. *Id.* ¶ 124.

17   Gelsinger had "bet the future of the company [on it]." *Id.*

18   Plaintiffs argue that these statements made by Gelsinger throughout 2023, along with

19   Zinsner's statements suggesting that preliminary P&Ls were available, indicate that Gelsinger was

20   regularly reviewing the Internal Foundry P&Ls in 2023 and using them to make operational

21   decisions. ECF 97, at 10–11.

22   Defendants counter that Plaintiffs have failed to add any particularized facts about

23   meetings, reports, dates, or witness accounts. ECF 100, at 3. Like Plaintiffs' previous allegations,

24   Plaintiffs cobble together a handful of vague public statements by Gelsinger. *Id.* But these

25   additional statements are consistent with the statements the Court previously found to be

26   insufficient to meet the higher, exacting pleading standards of the PSLRA. *Id.* The fact that

27   Zinsner, the CFO of the company, was developing the ability to create P&Ls for Intel Foundry in

28   2023 does not mean Gelsinger was regularly reviewing and using those P&Ls to allocate resources

United States District Court
Northern District of California

14

1    and assess performance. *Id.* Plaintiffs' arguments that a CEO who bets his company must have

2    been regularly reviewing the operating financial results is not a particularized fact. *Id.*

3         Here, the Court finds that the additional statements are not sufficient to establish a GAAP

4    violation. Gelsinger's statements are consistent with the statements the Court previously found to

5    be insufficient. These statements suggest a trial-and-error process in the implementation of the

6    Internal Foundry in 2023. Gelsinger's role in setting the company's culture by greenlighting

7    certain implementation strategies, does not suggest that Gelsinger was "mak[ing] decisions about

8    resources to be allocated to the" Internal Foundry. ECF 93-33, at 7 (ASC 280-10-50-1).

9    Gelsinger's statements must suggest decision-making regarding some sort of resource allocation to

10   the Internal Foundry through Gelsinger's regular review of the Internal Foundry P&Ls. Plaintiffs'

11   allegations do not suggest that Gelsinger regularly reviewed Internal Foundry P&Ls in 2023 or

12   that he made resource allocation decisions based on these P&Ls.

13        Plaintiffs also argue that the full foundry's discrete financial information was available in

14   2023. ECF 97, at 12. The Court previously found that "Zinsner's statements do suggest that

15   Internal Foundry Model P&L was available in a preliminary form in September 2023." ECF 87,

16   at 17. Plaintiffs go further and argue that these P&Ls were not preliminary—rather, they were

17   discrete financial information. ECF 97, at 12. However, because the Court finds that Plaintiffs

18   have not established regular review by the CODM, it need not address this argument.

19        Finally, Plaintiffs add allegations from their accounting expert Mr. Devor. ECF 88, ¶¶

20   209–63. In the Court's prior order, the Court considered *Smith v. Circuit City Stores, Inc.*, 286 F.

21   Supp. 2d 707 (E.D. Va. 2003). ECF 87, at 17. In *Circuit City*, plaintiffs alleged that Circuit City

22   should have reported results for its consumer-credit business earlier than it did. *Circuit City*, 286

23   F. Supp. 2d at 717. The court found that plaintiffs' allegations were conclusory as they did not

24   support "their claim with citations to documents, meetings, or individuals that may have conveyed

25   information." *Id.* As an "additional independent" ground for dismissal, the court held that "failure

26   to challenge the independent auditors' opinions weakens an allegation that a defendant violated

27   GAAP." *Id.* at 719.

28

15

United States District Court
Northern District of California

In its prior order, the Court found *Circuit City*'s reasoning to be persuasive, finding that Plaintiffs only rely on a few public statements made by Gelsinger and Zinsner to attempt satisfy the PSLRA standard—failing to counter EY's independent audit, failing to cite to any documents or meetings, or failing to provide any testimony from confidential witnesses. ECF 87, at 18. To counter this, Plaintiffs now bring in accounting expert Mr. Devor's opinion.

Mr. Devor asserts that "Intel, by reporting only the results of external foundry transactions and excluding revenue and expenses allocated to internal transactions, issued materially false and incomplete FY 2023 financial results." ECF 88, ¶ 209. To come to this conclusion, Mr. Devor reviewed publicly available information. *Id.* ¶ 212 (listing documents that were reviewed). However, for the CODM regular review, Mr. Devor relies on the same statements that the Court has rejected. *Id.* ¶¶ 240–47. Mr. Devor takes Gelsinger's statements and concludes that Gelsinger could not have made these statements regarding the implementation of the Internal Foundry unless he was regularly reviewing the Internal Foundry P&Ls in 2023 and using them to make resource allocation decisions. Here, Mr. Devor's analysis is largely a restatement of the Plaintiffs' allegations with Mr. Devor's stamp of approval.

For EY's audit, Mr. Devor simply states that "it is impossible to know what, if anything, EY knew relating to financial information of Internal Foundry, what testing it had performed, what representations were made by management to EY during the course of its audit relating to this area, and in general, the extent of audit work performed in this specific area by EY in the conduct of its audit of the overall financial statements." *Id.* ¶ 262. Thus, Mr. Devor does not draw any conclusions regarding EY's audit. *Id.*

Defendants argue that Mr. Devor's opinion should not be substituted for particularized facts under the PSLRA. ECF 91, at 15. First, Mr. Devor has no personal knowledge of relevant facts, replying only on publicly available information. *Id.* at 16. Second, Mr. Devor's confirmation of Plaintiffs' allegations is uncorroborated by any data, documents, witnesses, or independent analysis. *Id.* Third, Mr. Devor's statements do not show a GAAP violation as he concludes that Gelsinger would have been aware of financial information Zinsner was regularly preparing and reviewing. *Id.* (citing ECF 88, ¶ 263). Mr. Devor does not conclude that Gelsinger

1   reviewed the financial information—only that Zinsner did and must have told Gelsinger about it.

2   *Id.* Finally, Mr. Devor does not in fact contest EY's audit opinion.  *Id.*

3          Here, while the Court does find Mr. Devor to have relevant expertise, Mr. Devor's opinion

4   is based on the same public statements that the Court already found to be insufficient.  Mr.

5   Devor's analysis does not alter the Court's conclusions.

6          The Court notes that there exists an overarching policy consideration.  Plaintiffs complain

7   that Defendants did not report their preliminary draft P&Ls for the Internal Foundry while the

8   Internal Foundry was being implemented in a trial-and-error fashion throughout 2023.  The Court

9   foresees that the risk of reporting false or misleading information may be heightened had Intel

10  reported preliminary draft P&Ls that did not undergo robust auditing review.  GAAP sets out a

11  specific standard for segment reporting.  Here, Plaintiffs' allegations, even with Mr. Devor's

12  opinion, do not meet the "higher, more exacting pleading standards" of the PSLRA to allege

13  falsity based on GAAP violation.  *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 604.

14                    **b.  Gelsinger's and Zinsner's Statements**

15         Plaintiffs again allege falsity as to separate statements made by Gelsinger and Zinsner

16  regarding the Intel Foundry.  ECF 88, ¶¶ 203–07.  Many of these "savings and efficiency"

17  statements and "traction and demand" statements were rejected by the Court in its prior order.  *See*

18  ECF 87, at 18–22.  Undaunted, Plaintiffs assert similar, and at times identical arguments, urging

19  the Court to reconsider its prior rulings.

20                    **i.    Savings and Efficiency Statements**

21         Plaintiffs allege that when announcing Intel's 2023 financial results, Zinsner claimed "[w]e

22  continued to drive operational efficiencies in the fourth quarter, and comfortably achieved our

23  commitment to deliver $3 billion in cost savings in 2023."  ECF 88, ¶ 203.  Gelsinger touted "our

24  ongoing relentless focus on driving operating leverage and expense management, including

25  comfortably meeting our $3 billion cost savings commitment for fiscal year '23."  *Id.* ¶ 205.  An

26  investor presentation from January 25, 2024, highlighted "Operational Efficiencies" and directly

27  below stated ">$3B in FY'23, Internal Foundry Model."  *Id.* ¶ 204.  Plaintiffs argue that Intel's

28

United States District Court
Northern District of California

1   touting of $3 billion in cost saving while also advertising the Internal Foundry was materially

2   misleading.  ECF 99, at 16.

3        In its prior order, the Court found efficiencies statements and savings statements to be

4   unactionable.  ECF 87, at 18–21.  For the efficiencies statements, the Court found that while the

5   some of the challenged statements contained non-forward-looking portions, these non-forward-

6   looking portions were statements regarding the IFS that were not alleged to be false.  *Id.* at 19–20.

7   For the savings statements, the Court found that the context of Defendants' statements made clear

8   that $3 billion in cost savings were a separate initiative from the Internal Foundry.  *Id.* at 21.

9        Here, Plaintiffs renew their challenge, asking the Court to reconsider its order.  Plaintiffs

10  argue that these statements that the Court found to be unactionable are "equally open to Plaintiffs'

11  alleged interpretation."  ECF 99, at 17.  Plaintiffs improperly seek reconsideration.  Here, Intel

12  separates its Internal Foundry from its $3 billion saving initiative: "The internal foundry model is

13  also integral to Intel's multiyear cost efficiency effort, which includes reducing costs by $3 billion

14  in 2023, and $8 billion to $10 billion in cost savings exiting 2025—which is where the new model

15  plays a significant role."  ECF 88, ¶ 100.

16       Plaintiffs did not heed the Court's prior order.  Plaintiffs fail to provide particularized facts

17  to allege falsity for efficiencies and savings statements.  Leave to amend is not an end-run vehicle

18  to challenge the Court's prior order without pleading any additional particularized facts.

19       The Court declines to reverse prior ruling.  Here, Plaintiffs fail to allege falsity as to

20  savings and efficiencies statements.

21          **ii.**    **Traction and Demand Statements**

22       On March 28, 2024, Gelsinger said "we are seeing significant traction" in the foundry

23  journey and "[t]o support the growing demand for our foundry offering, we continued to expand

24  our manufacturing capacity and capabilities."  ECF 88, ¶ 207.  Plaintiffs allege that such

25  statements were false and misleading.  *Id.* ¶ 208.

26       Plaintiffs' arguments are again a plea for the Court to reconsider its prior order.  In its prior

27  order, the Court found that "Plaintiffs' argument ignore[d] the explicit context in which

28  Gelsinger's statements were made.  Gelsinger clearly cite[d] to four customer commitments and

United States District Court
Northern District of California

1    five wins when making his statements." ECF 87, at 20. Plaintiffs omit the context sandwiched

2    between Gelsinger's statements is: "We began 2023 with a commitment from one Intel 18A

3    foundry customer and ended the year with four. We also achieved five advanced packaging wins,

4    a testament to the advantages of Intel Foundry." ECF 88, ¶ 144.

5          Nevertheless, Plaintiffs renew their argument, arguing that while Gelsinger cited four 18A

6    customers and five advanced packaging wins, his statement was not limited to that narrow context.

7    ECF 99, at 18. Plaintiffs argue that his statement also referred to growing demand in the Internal

8    Foundry. *Id.*

9          Defendants point out that the Court has already rejected this argument, and Plaintiffs put

10   forth no new particularized facts to suggest a different conclusion. ECF 100, at 9. Plaintiffs do

11   not contest the IFS's commitments and wins, but rather, contend that Gelsinger should have also

12   made a caveat regarding internal transactions. ECF 99, at 18.

13         The Court declines to reverse prior ruling. Here, Plaintiffs fail to allege falsity as to

14   Gelsinger's traction and demand statements.

15              **2.  Scienter and Loss Causation**

16         Defendants also challenge scienter and loss causation. However, because the Court finds

17   that Plaintiffs have failed to allege falsity, the Court need not reach these elements. *Wochos v.*

18   *Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) ("[W]e find the issue of falsity to be dispositive,

19   and we therefore do not reach the issues of scienter or loss causation with respect to that

20   complaint.").

21         The Court finds that Plaintiffs have failed to alleged falsity. Accordingly, the Court

22   **GRANTS** the motion to dismiss as to the Section 10(b) and Rule 10b-5 claims.

23         **B.    Section 20(a)**

24         "In order to prove a prima facie case under [Section] 20(a), plaintiff must prove: (1) a

25   primary violation of federal securities laws . . .; and (2) that the defendant exercised actual power

26   or control over the primary violator . . . ." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th

27   Cir. 2000) (citation omitted). "Section 20(a) provides derivative liability for those who control

28   others found to be primarily liable under the Act." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F.

United States District Court
Northern District of California

Supp. 2d 1190, 1205 (N.D. Cal. 2012) (citation omitted). "Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same." *Id.* (citation omitted).

Because the Court finds that Plaintiffs have failed to properly allege a Section 10(b) and Rule 10b-5 claim, Plaintiffs have likewise failed to allege a Section 20(a) claim. Accordingly, the Court **GRANTS** the motion to dismiss as to the Section 20(a) claim.

### C.    Leave to Amend

Pursuant to Rule 15(a)(2), a party may amend its pleadings with the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* This policy is applied with "extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (internal citation omitted). The nonmovant bears the burden of demonstrating why leave to amend should not be granted. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). The Supreme Court has outlined five factors to consider in deciding whether leave to amend is warranted: (1) bad faith on the part of the movant, (2) undue delay by the movant, (3) repeated amendments by the movant, (4) undue prejudice to the nonmovant, and (5) futility of the proposed amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

In the previous motion to dismiss, Defendants argued that leave to amend is futile because Plaintiffs only rely on publicly filed statements and no statements from confidential witnesses. ECF 87, at 23. Over Defendants' arguments, the Court found the leave to amend was not futile and provided Plaintiffs with leave "to add particularized facts in support of their falsity allegations." *Id.*

After providing leave, Plaintiffs have again failed to allege falsity, largely using leave as an opportunity to repeatedly challenge the Court's prior order. Here, the Court finds that the amended complaint suffers from the same deficiencies as the previously dismiss complaint. ECF 87, at 24. Plaintiffs' complaint continues to rely solely on publicly filed statements and again fails to allege falsity. At this stage, it is unclear how Plaintiffs could add further particularized facts to

satisfy the strict pleading requirement of the PSLRA and Rule 9(b).  The Court finds that amendment would be futile and denies leaves to amend.

**V.    CONCLUSION**

For the reasons stated above, the Court **GRANTS** Defendants' motion to dismiss with prejudice for all claims.

This Order resolves ECF 91.  The Clerk of the Court is ordered to terminate the matter.

**IT IS SO ORDERED.**

Dated: July 23, 2025

TRINA L. THOMPSON
United States District Judge